## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RICHARD GERICKE, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

UBIQUITI NETWORKS, INC., ROBERT J. PERA, KEVIN RADIGAN, JOHN RITCHIE and MARK SPRAGG,

Defendants.

No. 17-cv-7279

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff Richard Gericke ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, and other publicly available documents, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company") common stock between September 28, 2012 and September 18, 2017, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.     Ubiquiti develops technology platforms for high-capacity distributed Internet access, unified information technology, and next-generation consumer electronics for home and personal use. The Company does not employ a traditional sales force.  Instead, it purports to "drive[] brand awareness largely through the company's user community where customers can interface directly with R&D, marketing, and support."  The Company calls this user community the "Ubiquiti Community."

3.     Information newly disclosed to the market reveals that that the size of the "Ubiquiti Community" is grossly exaggerated.

4.     On September 18, 2017, Citron Research ("Citron") issued a report entitled "Cintron Exposes Ubiquiti Networks," (the "Citron Report") in which Citron detailed a series of "alarming red flags," indicating that the Company has been deceiving investors and is engaged in "corporate fraud," including, among other things, that the Company has misrepresented the size of its purported "Ubiquiti Community", as well as its levels of accounts receivable, among other things.

5.     On this news, Ubiquiti's share price fell nearly 8% to close at $50.62 on September 18, 2017.

6.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the number of the Company's purported user community was drastically overstated; (ii) that it had exaggerated its publicly reported accounts receivable; and (iii) that as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading.

## BACKGROUND

7.   The Citron Report, published on September 18, 2017, asserted that Ubiquiti's financial reports "have every indication of being completely fraudulent."

8.   Citron commented on various suspicious elements of Ubiquiti's public financial statements.  For example, Citron noted that Ubiquiti had achieved various operating metrics that far outpaced its larger rivals.  According to Citron, Ubiquiti had operating margins and return on equity of 33.5% and 49.2%, respectively, while its closest competitor – the far larger and better-known Cisco Systems, Inc. – only generated operating margins and return on equity of 26.5% and 49.2% respectively, with other competitors trailing Cisco.

9.   Citron also cast aspersions on Ubiquiti's network of far-flung overseas distributors, insinuating that "Ubiquiti's big markets are money-laundering havens."  Plus, Citron observed that Ubiquiti's reported cash balances generate far lower interest income, as a percentage, than other tech companies' cash balances.

10.  Citron comments on repeated turnover in the executive ranks of Ubiquiti, and it alleged that an arrest warrant for a Taiwanese Ubiquiti executive, and a lawsuit alleging software piracy, (among other issues), were indicative of "an underbelly of corrupt corporate culture."

11.  In addition to innuendo, the Citron Report also documented verifiable fraudulent statements concerning the reporting of accounts receivable, and the size of Ubiquiti's reported user base a/k/a the "Ubiquiti Community."  These disclosures form the basis of this Action.

## JURISDICTION AND VENUE

12.  The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

13.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.   This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15.   Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company's common stock trades on the NASDAQ Global Select Market.

16.   In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

17.   Plaintiff Richard Gericke was a shareholder of Ubiquiti during the Class Period. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

18.   Defendant Ubiquiti Networks, Inc. is a Delaware corporation with its principal executive offices located at 685 Third Avenue, 27th Floor, New York, New York 10017.  The Company sells equipment, and provides the related software platforms, worldwide through a network of over 100 distributors and on-line retailers.  The Company trades on the NASDAQ exchange under the ticker symbol "UBNT."

4

19.  Defendant Robert J. Pera ("Pera") co-founded Ubiquiti and has served at all relevant times as the Company's Chairman and Chief Executive Officer.

20.  Defendant John Ritchie ("Ritchie") served as Chief Financial Officer of Ubiquiti from 2010 until he resigned that position in February 2013.[1]

21.  Defendant Mark Spragg ("Spragg") served as Interim Chief Accounting Officer from August 4, 2015 until May 3, 2016.

22.  Defendant Kevin Radigan ("Radigan") has served as the Company's Principal Financial and Accounting Officer since May 3, 2016.

23.  Collectively, Pera, Ritchie, Spragg and Radigan are referred to throughout this complaint as the "Individual Defendants."

24.  The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market.  The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their positions within the Company and their access to material non-public information available to

---

[1]  The Company has had a revolving door of senior financial executives since Mr. Ritchie resigned the Company on February 28, 2013.  He was replaced by Craig L. Foster as CFO.  Mr. Foster resigned on April 21, 2015 and was replaced by non-defendant Hartley Nissenbaum as "interim CFO," while the Company announced that "Mr. Foster's duties as principal financial officer and principal accounting officer [would] be performed on an interim basis by Rohit Chakravarthy … who has also been appointed as the Company's Chief Accounting Officer."   Chakravarthy resigned after less than four months, and Defendant Spragg was named Interim Chief Accounting Officer effective August 4, 2015.  Defendant Spragg lasted less than a year; he was replaced by Defendant Radigan on May 3, 2016.

them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### I.   Ubiquiti's Reported Receivables Do Not Comport With its Customers' Reported Payables.

25.   The Class Period begins on September 28, 2012.  That day, Ubiquiti filed its annual report on Form 10-K with the SEC for the period ending June 30, 2012.  Among other things, the Company's September 28, 2012 Form 10-K disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million:

|  | June 30, | |
|  | 2012 | 2011 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $122,060 | $76,361 |
| Accounts receivable, net of allowance for doubtful accounts of $1,266 and $596, respectively | 75,644 | 39,811 |
| Inventories | 7,734 | 5,663 |
| Current deferred tax asset | 882 | — |
| Prepaid expenses and other current assets | 1,577 | 6,267 |
| Total current assets | 207,897 | 128,102 |
| Property and equipment, net | 4,471 | 1,022 |
| Long-term deferred tax asset | 232 | 324 |
| Other long–term assets | 1,136 | 2,230 |
| Total assets | $213,736 | $131,678 |

26.   That Form 10-K also identified customers with receivables over 10 percent of its total outstanding receivables.  In particular, Ubiquiti reported that a company called "Discomp" accounted for 12 percent of its reported $75.6 million in receivables, meaning that Discomp's

share of the receivable was $9.072 million.  The 10-K identified such customers on the chart reproduced below:

| | Percentage of Revenues Years Ended June 30, | | | Percentage of Accounts Receivable June 30, | |
|---|---|---|---|---|---|
| | **2012** | **2011** | **2010** | **2012** | **2011** |
| Flytec Computers Inc. | 16% | 20% | 17% | 19% | 21% |
| Streakwave Wireless Inc. | 10% | 15% | 13% | 11% | 25% |
| Discomp | * | * | * | 12% | * |
| * denotes less than 10% | | | | | |

27.  The Company's September 28, 2012 Form 10-K was signed by Defendants Pera and Ritchie and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Defendants Pera and Ritchie each certified:

1. I have reviewed this annual report on Form 10-K of Ubiquiti Networks, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Paragraph omitted in accordance with Exchange Act Rule 13a-14(a)];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

28.   According to its web site, www.discomp.eu, Discomp is a vendor of computer networking equipment in the Czech republic.

29.   According to another prominent market research analyst, Discomp only reported a total "trade payable" of approximately $3.43 million as of June 30, 2012 to the Czech Republic's Public Registry and Collection of Documents within the Ministry of Justice.

30.   It is simply impossible to square the $9.072 million receivable that Ubiquiti reported, with the total $3.43 million that Discomp reported.

31.   Moreover, the large discrepancy between Ubiquiti's report of the Discomp receivable, and Discomp's report of its own "trade payable" was not an isolated occurrence.

32.   On August 21, 2015, the Company filed its annual report on Form 10-K with the SEC for the period ended June 30, 2015, reporting, among other things, a total of $66.1 million in receivable as of that day:

| | June 30, | |
| | 2015 | 2014 |
| --- | --- | --- |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $446,401 | $347,097 |
| Accounts receivable, net of allowance for doubtful accounts of $1,071 and $1,395, respectively | 66,104 | 54,871 |
| Inventories | 37,031 | 46,349 |
| Current deferred tax assets | 1,535 | 884 |
| Prepaid income taxes | 2,566 | 3,256 |
| Prepaid expenses and other current assets | 27,709 | 13,267 |
| Total current assets | 581,346 | 465,724 |
| Property and equipment, net | 15,602 | 7,260 |
| Long-term deferred tax assets | 1,515 | 1,255 |
| Other long–term assets | 2,109 | 1,912 |
| Total assets | $600,572 | $476,151 |

33.   Ubiquiti once again disclosed customers with receivables greater than 10 percent of the total.  In the chart below, it disclosed that a customer called P.W. Batna Magdalena Mucha ("Batna") accounted for 12 percent of the receivables as of that date – meaning that Batna's share was $7.93 million.

| | Percentage of Revenues | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|
| | Years Ended June 30, | | | June 30, | |
| | 2015 | 2014 | 2013 | 2015 | 2014 |
| Flytec Computers, Inc. | * | 13% | 13% | * | 13% |
| Streakwave Wireless, Inc. | * | * | * | 13% | 12% |
| P.W. Batna Magdalena Mucha | * | * | * | 12% | 12% |

*denotes less than 10%*

34.  The Company's August 21, 2015 Form 10-K was signed by Defendants Pera and Spragg, the interim Chief Accounting Officer, and contained SOX certifications, signed by Pera and Spragg, substantially similar to the certifications described in ¶27, *supra*.

35.  On February 4, 2016, Ubiquiti filed its quarterly report with the SEC on Form 10-Q for the period ending December 31, 2015, disclosing, among other things, that it had accounts receivable of $64.6 million as of December 31, 2015 and it reiterated the $66.1 million receivable figure as of June 30, 2015 in a separate column:

| | December 31, 2015 | June 30, 2015 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 496,672 | $ 446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | 64,568 | 66,104 |
| Inventories | 33,105 | 37,031 |
| Vendor deposits | 15,620 | 19,998 |
| Current deferred tax asset | 1,535 | 1,535 |
| Prepaid income taxes | — | 2,566 |
| Prepaid expenses and other current assets | 8,440 | 7,711 |
| Total current assets | 619,940 | 581,346 |
| Property and equipment, net | 13,359 | 15,602 |
| Long-term deferred tax asset | 1,538 | 1,515 |
| Other long-term assets | 1,918 | 2,109 |
| Total assets | $ 636,755 | $ 600,572 |

36.   In the Company's February 4, 2016 10-Q, Ubiquiti stopped reporting the names of customers with receivables greater than 10 percent of the total receivable.  Instead, Ubiquiti employed pseudonyms.  Specifically, Ubiquiti identified "Customer C" as accounting for 12 percent of the June 30, 2015 account receivable, or $7.9 million, and 14 percent of the December 31, 2015 receivable:

| | Percentage of Revenues | | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|---|
| | Three Months Ended December 31, | | Six Months Ended December 31, | | December 31, | June 30, |
| | 2015 | 2014 | 2015 | 2014 | 2015 | 2015 |
| Customer A | 13% | 12% | 11% | 11% | * | * |
| Customer B | * | 13% | * | 11% | * | 13% |
| Customer C | * | * | * | * | 14% | 12% |
| Customer D | * | * | * | * | 15% | * |

*denotes less than 10%*

37.   Ubiquity further reported in its February 4, 2016 Form 10-Q that the total accounts receivable as of December 31, 2015 were $64.6 million:

| | December 31, 2015 | June 30, 2015 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 496,672 | $ 446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | 64,568 | 66,104 |
| Inventories | 33,105 | 37,031 |
| Vendor deposits | 15,620 | 19,998 |
| Current deferred tax asset | 1,535 | 1,535 |
| Prepaid income taxes | — | 2,566 |
| Prepaid expenses and other current assets | 8,440 | 7,711 |
| Total current assets | 619,940 | 581,346 |
| Property and equipment, net | 13,359 | 15,602 |
| Long-term deferred tax asset | 1,538 | 1,515 |
| Other long-term assets | 1,918 | 2,109 |
| Total assets | $ 636,755 | $ 600,572 |

11

38. That means that Batna's 14 percent of the $64.6 million receivable was $9.04 million.

39. The Company's February 4, 2016 Form 10-K was signed by Defendants Pera and Spragg, the interim Chief Accounting Officer, and contained SOX certifications, signed by Pera and Spragg, substantially similar to the certifications described in ¶27, *supra*.

40. According to its web site, https://www.anteny24.com/, Batna is headquartered in the Polish city of Czestochowa.  It also sells computer networking equipment.

41. According to Batna's audited financial statements, it had total "Trade Payables" of $2.746 million as of December 31, 2015.  This figure is far at odds with the more than $9 million in receivables claimed by Ubiquiti in its Feb. 4, 2016 10-Q.

42. It is, once again, simply impossible to square Ubiquiti's statements about its reported customers' outstanding receivables with the customers' own statements.

## II. **Ubiquiti Has Inflated the Number of People in the "Ubiquiti Community."**

43. The Citron Report also charged that Ubiquiti's repeated announcements that it has a user base, a/k/a "Ubiquiti Community," of 4 million people is false.

44. Ubiquiti has made this assertion repeatedly.   On February 9, 2017, Ubiquiti announced its second quarter 2017 financial results in a press release that stated that Ubiquiti's "growth is supported by the Ubiquiti Community, a global grass-roots community of 4 million entrepreneurial operators and systems integrators who engage in thousands of forums."   The press release was filed that day as an exhibit to a form 8-K signed by Pera.

45. This same statement was repeated on May 4, 2017, when Ubiquiti announced its third quarter 2017 financial results in a press release filed that day as an exhibit to the Company's Form 8-K filed with the SEC.

46.     And again on August 3, 2017, when Ubiquiti announced its preliminary fourth quarter 2017 financial results in a press release filed that day as an exhibit to the Company's Form 8-K filing with the SEC.

47.     On August 25, 2017 Ubiquity filed a form 10-K signed by Pera and Radigan which contained SOX certifications, signed by Pera and Radigan, substantially similar to the certifications described in ¶27, *supra*.  That 10-K increased the size of the Ubiquiti community, describing it as "a global, grass-roots community of **over** 4 million entrepreneurial operators and systems integrators who engage in thousands of on-line forums."  (emphasis added).

48.     Ubiquiti also disseminated an "investor presentation" on February 21, 2017 claiming that the "Ubiquiti Community" contained "4 million registered users."  The presentation was an exhibit to a form 8-K filed that day, and signed by Pera.

49.     Ubiquiti repeated the claim on August 10, 2017 in another "investor presentation" filed as an exhibit to a form 8-K filed that day, and signed by Pera.

50.     A large Ubiquiti Community is significant for Ubiquiti because the Company lacks a traditional sales force, instead relying on its purported connection to this rabid user community to drive demand for its products.

51.     The Ubiquiti Community is central to Ubiquiti's strategy.  For example, in the August 25, 2017 10-K, Ubiquiti said that its "business model is driven by a large, growing and highly engaged community of service providers, distributors, value added resellers, systems integrators and corporate IT professionals, which we refer to as the Ubiquiti Community.  The Ubiquiti Community is a critical element of our business strategy as it enables us to drive: rapid customer and community driven product development … Scalable sales and marketing model … Self-sustaining product support."

13

52.     Essentially, Ubiquiti claims to have outsourced substantial elements of its product development, sales and marketing, and product support functions to its own customers – supposedly at substantial cost savings.

53.     In the Citron Report, Citron showed how each registered user was given a unique user ID, that appears in the URL (a/k/a web address) of their profile page.  For example, a user who registered in June 2017 received the user ID 643002, which tied to a web page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/643002.

54.     The Citron Report showed that the user IDs are issued sequentially.  A user ID registered in 2007 had user ID 94, and a profile page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/94.

55.     The Citron Report showed that the user IDs ended at about 710,000 – far less than the 4,000,000 users reported.  According to Citron, anyone searching for a profile on a user ID higher than 720,000 would see a message that "Person does not exist."  (As of the date of this Complaint, the number has risen: now, User IDs higher than 730,000 generate a "Person does not exist" message.)

56.     Ubiquiti Community members can post in online message boards.  Yet, Citron also reported that "**97% of accounts never post**.  In an analysis of 11,250 recently registered accounts, 10,910 out of 11,250 (96.97%) never posted a single message on the forum.  This is remarkable given that all the forum material is available without registering an account and the only apparent benefit to registering is the ability to post."   Indeed, Citron asserted that "The majority of these 700,000 accounts are bots," e.g., "web robots."[2]

---

[2]   A "Web robot" "is a software application that runs automated tasks (scripts) over the internet."  See, e.g., https://en.wikipedia.org/wiki/Internet_bot (visited September 20, 2017).

57.     The exposure by Citron comes on the heels of Pera's sale of one million shares of Ubiquiti stock, for $61.25 apiece, on August 28, 2017, according to an SEC Form 4 dated August 30, 2017.   Notably, that Form 4 filing does not specify that the sale occurred as part of any  10b5-1 plan. Pera still owns 56.3 million of Ubiquiti's 80.4 million shares outstanding, according to the Form 4, providing a powerful incentive for him to take extreme measures to prop up the Company's stock price.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Ubiquiti securities between September 28, 2012 through September 18, 2017, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

59.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ubiquiti securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  As of August 22, 2017, the Company had 80,353,190 shares of common stock outstanding, approximately 24.1 million of which were held by someone other than Pera.  Record owners and other members of the Class may be identified from records maintained by Ubiquiti or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.      Whether the Exchange Act was violated by Defendants;

b.      Whether Defendants omitted and/or misrepresented material facts;

c.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.      Whether the price of the Company's stock was artificially inflated; and

f.      The extent of damage sustained by Class members and the appropriate measure of damages.

61.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

62.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

64.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

65.     During the Class Period, Plaintiff and the Class purchased Ubiquiti securities at artificially inflated prices and were damaged thereby.

66.     Ubiquiti's stock closed at $54.95 on September 15, 2017On September 18, 2017, the Citron Report was published, detailing a series of "alarming red flags," indicating that the Company has been deceiving investors and is engaged in "corporate fraud," including, among other things, that the Company has misrepresented the size of its purported "Ubiquiti Community", as well as its levels of accounts receivable, among other things.

67.     On this news, Ubiquiti's share price fell nearly 8% to close at $50.62 on September 18, 2017.

68.     The decline Ubiquiti's share price is directly attributable to the disclosures in the Citron Report.

## FRAUD ON THE MARKET

69.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      The omissions and misrepresentations were material;

c.      The Company's common stock traded in efficient markets;

d.      The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.      Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

70.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

71.     The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

72.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants)

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

79.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.     As set forth above, Ubiquiti and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.       awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.       awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.       awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  September 25, 2017              **GARDY & NOTIS, LLP**

                                        By: /s/ Jennifer Sarnelli
                                        James S. Notis
                                        Jennifer Sarnelli
                                        126 East 56th Street, 8th Floor
                                        New York, NY 10022
                                        Tel: 212-905-0509
                                        Fax: 212-905-0508
                                        jnotis@gardylaw.com
                                        jsarnelli@gardylaw.com

                                        **BLOCK & LEVITON LLP**
                                        Jeffrey C. Block
                                        Thomas Kirchoffer
                                        Bradley J. Vettraino
                                        155 Federal Street, Suite 400
                                        Boston, MA 02110
                                        Tel: 617-398-5600
                                        Fax: 617-507-6020
                                        Jeff@blockesq.com
                                        Tom@blockesq.com
                                        Bradley@blockesq.com

                                        *Counsel for Plaintiff*